**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

JARMAN YACOUB,

                   Plaintiff,

      v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

           Defendant.

_____

Case No.  1:14-cv-00884-SKO

**ORDER ON PLAINTIFF'S COMPLAINT**

(Doc. 25)

## I.   INTRODUCTION

Plaintiff, Jarman Yacoub ("Plaintiff"), seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI") benefits pursuant to Title XVI of the Social Security Act.  42 U.S.C. § 1381-83.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1]   The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7; 9.)

## II.   FACTUAL BACKGROUND

Plaintiff was born on May 31, 1961, and protectively filed for disability benefits on February 4, 2011.  (Administrative Record ("AR") 10; 18; 157.)  Plaintiff claims she is disabled due to degenerative disc disease, bilateral carpal tunnel syndrome, degenerative joint disease of the knees, low back pain, and depression.  (*See* AR 12; 162.)

**A.   Relevant Medical Evidence**

**1.   Treating Physicians, Physical Therapy, and Social Worker Records**

On May 27, 2008, Plaintiff's physician Dr. Amanda Crews, M.D., wrote a letter to the agency, noting that she had treated Plaintiff since October 24, 2006, for "chronic low back pain, carpal tunnel syndrome, hypercholesterolemia, depression, diplopia, and insomnia."  (AR 272.)  Dr. Crews opined Plaintiff is "unable to perform any meaningful employment" due to the limitations of her impairments; cannot stand or walk "for more than a few minutes at a time" and must take frequent rest breaks; cannot sit for more than an hour at a time; cannot lift anything over ten pounds; and cannot climb, stoop, or bend.  (AR 272.)  Dr. Crews noted, however, that Plaintiff's "biggest issue is her depression," which contributes to "concentration issues and poor follow through with tasks."  (AR 272.)  Plaintiff has had only a "partial response" to her antidepressant medication, and suffers from anxiety, startle response, and frequent suspicion as a side effect of her medication.  (AR 272.)  Plaintiff attended physical therapy in June and July of 2008 (AR 460-61), but quit on August 4, 2008 (AR 464).

A February 25, 2010, x-ray of Plaintiff's left foot revealed moderate posterior and plantar calcaneal spurring, but noted no fractures.  (AR 344; 444.)  An x-ray of Plaintiff's left knee revealed "no significant soft tissue, bony, or articular pathology," and an x-ray of Plaintiff's right knee revealed mild patellar spurring but no joint effusion or fractures.  (AR 345; 445.)  On July 27, 2010, Plaintiff was seen by Dr. Christopher Hawley, M.D., for evaluation of her left foot plantar fasciitis and left knee osteoarthritis.  (AR 347; 447.)  She had been seen for ten physical therapy visits, been on anti-inflammatory medications, and had a cortisone injection for the left knee, all without success in relieving her symptoms.  (AR 347; 447.)  On examination, Plaintiff had full range of motion and mild crepitus in her left knee and moderate tenderness to palpation

2

over both joint lines and around the patellar facets.  (AR 347; 447.)  Plaintiff also had tenderness to palpation over the inferior aspect of the left calcaneus, near the plantar fascia origin, and pain with stretching the plantar fascia.  (AR 347; 447.)  Plaintiff has bilateral mildly flat feet.  (AR 347; 447.)  Dr. Hawley recommended semi-rigid orthotics for Plaintiff's plantar fasciitis and continued stretching exercises and a trial of a Synvisc-One injection to her left knee.  (AR 347; 447.)

On February 4, 2011, Plaintiff told Pete Thompson, L.C.S.W., she had been depressed since the end of 2005 when a family member "became ill after a stroke" and she "has not been able to go back to work since."  (AR 335.)  Plaintiff reported having "no energy or motivation to do anything," feeling "worthless," and having trouble sleeping at night.  (AR 335.)  On March 3, 2011, Plaintiff reported having difficulty sleeping and feeling guilty over her mother's stroke. (AR 334.)  On April 8, 2011, Mr. Thompson noted Plaintiff was no longer seeing her daughter regularly and was upset by the distance.  (AR 333.)  Plaintiff was stressed because her husband and daughter had been in multiple bad accidents in a short span of time.  (AR 333.)  On May 13, 2011, Mr. Thompson noted Plaintiff was depressed and continued to "lament" about being in pain. (AR 332.)   Her son lived with her and her husband and was "overwhelmed with [the] responsibility" of caring for his parents.  (AR 332.)

Physical therapy notes on July 1, 2011, noted that despite visits since May of 2011, Plaintiff had shown "essentially no change in function" and "no significant improvement in [ ] pain," continued to demonstrate a very slow, labored gait, and had "limited potential for significant progress."  (AR 449; 462-63; *see also* AR 456-58 (treating notes indicating no progress at each visit).)  Because of her lack of progress, therapist Matt Tresenriter, P.T., recommended physical therapy be discontinued.  (AR 449; 462-65.)

On September 12, 2011, a lumbar spine x-ray revealed mild degenerative changes, noting five lumbar-type vertebral bodies with lumarization of S1, some levoconvex curvature of the lumbar spine with mild anterior marginal osteophyte formation, particularly of L2 through L4, and no subluxation.  (AR 366.)  On May 31, 2012, a right knee x-ray revealed mild patellar spurring, but noted no fracture, joint effusion, or joint narrowing, no loose bodies, and no spurring at the joint margins.  (AR 442.)  An x-ray of the right ankle revealed no significant osseous, articular, or

1    soft tissue abnormalities.  (AR 443.)

2        On November 7, 2012, Dr. Crews filled out an agency questionnaire.  (AR 454.)  Dr.

3    Crews opined Plaintiff's impairments of osteoarthritis, low-spine pain, carpal tunnel syndrome,

4    and depression would prevent her from performing full-time work at any exertional level and,

5    taken together, her impairments meet or equal Listing 1.04 (disorders of the spine).  (AR 454.)

6    Dr. Crews opined Plaintiff could sit a maximum of one hour and stand or walk a maximum of

7    fifteen minutes at a time, and Plaintiff must lie down or elevate her legs at least two to three hours

8    during an eight hour day.  (AR 454.)

9        **2.    Internal Medicine Evaluation**

10       On May 27, 2011, Dr. Roger Wagner, M.D., performed a comprehensive internal medicine

11   evaluation at the agency's request.  (AR 279-84.)  Plaintiff spoke with the aid of an interpreter.

12   (AR 279.)  Plaintiff reported low back pain without radiation, bilateral knee pain, and bilateral

13   carpal tunnel syndrome as her chief complaints.  (AR 279.)  Plaintiff used a walker and reported

14   having difficulty walking, but "refuse[d] to give [ ] any accurate walking distance."  (AR 279.)

15   Plaintiff reported being able to sit for approximately 30 minutes before needing to move around to

16   relieve her back pain, and reported bending and lifting as the worst triggers for her back pain.

17   (AR 279.)  Plaintiff described her left knee pain as worse than her right knee pain, and she has

18   some patellar cartilage damage in both knees.  (AR 279.)  Plaintiff had never had surgery or

19   arthrocentesis in her knees, and refused an injection.   (AR. 279.)   Plaintiff's carpal tunnel

20   syndrome is worse on her left side; she complained of forearm pain with occasional fingered

21   numbness which usually faded after several minutes.  (AR 280.)  She reported that carpal tunnel

22   release surgery had been recommended to relieve her symptoms, but she had declined to have it

23   done.  (AR 280.)  Plaintiff reported she lived with her husband and son, and while she does not do

24   any housecleaning, she cooks for her family, drives, shops occasionally, and performs her own

25   activities of daily living without assistance.  (AR 280.)

26       On examination, Plaintiff displayed positive Tinel's in both wrists and negative Phalen's,

27   mild paravertebral muscle tenderness, and continuous grinding in the left knee but no real

28   tenderness.  (AR 280; 282.)  Plaintiff's motor strength is 5/5 bilateral upper and lower extremities.

(AR 282.) Dr. Wagner further observed that Plaintiff

> . . . was easily able to get out of her chair in the waiting room, however, then bent over approximately 30 degrees at the low back and pushed a wheeled walker and mov[ed] at a slow to moderate rate. She did this without assistance. She sat comfortably through the entire history taking. She was able to get on and off the examination table . . . . slightly slowly with some moaning and groaning. She was easily able to bend over at the waist, take off shoes and put them on without any obvious significant problems. [She] did show very poor compliance when attempting to get her to perform the arm strength exercises.

(AR 280.) Plaintiff was able to walk on her toes and on her heels, though she complained of pain while doing so. (AR 281.) Though Plaintiff came in using her walker, Dr. Wagner opined that "[t]his does not appear to be necessary at the current time." (AR 281.)

Dr. Wagner opined Plaintiff is able to stand and walk up to six hours a day due to her knee problems and low back pain and has no limitations on her ability to sit, does not need an assistive device, can lift 20 pounds occasionally and ten pounds frequently, should not climb or balance on ladders or scaffolds, can climb stairs occasionally, perform manipulative activities frequently, and has no environmental limitations. (AR 283-84.)

### 3.    Mental Status Evaluation

On June 24, 2011, Dr. Carol Fetterman, Ph.D., performed a comprehensive mental status evaluation at the agency's request. (AR 285-87.) Plaintiff spoke with the assistance of an interpreter. (AR 285.) Plaintiff presented "in a friendly manner, made fair eye contact, and [her] facial expression was normal." (AR 285.) Plaintiff used a walker and her gross motor function was "not normal." (AR 285.) Plaintiff reported "moderately disabling" depression and anxiety, and stated that her "current mental health symptoms" impact her daily living. (AR 285.) Plaintiff was born in Iran and came to California in 2000. (AR 285.) Plaintiff reported she had completed the tenth grade and had a learning disability in math, but denied being placed in special education. (AR 285.) Plaintiff reported leaving work due to physical and emotional difficulties, and noted she "was very depressed over the death of her mother." (AR 285-86.) Plaintiff reported being independent for basic activities of daily living and not needing help with preparing meals, but reported being unable to make change at the store and being unable to drive. (AR 286.)

//

5

On examination, Dr. Fetterman noted Plaintiff had a very difficult time understanding and remembering instructions, and observed her to be passively uncooperative.  (AR 286.)  Plaintiff was partially oriented to place and time; she did not know the date or the day or the season and did not know the county or clinic name.  (AR 286.)  Plaintiff's concentration and attention was impaired, her memory was adequate, her judgment and insight were limited, and her abstraction and proverbs were intact.  (AR 286.)  Dr. Fetterman diagnosed Plaintiff as having a mood disorder, and opined that Plaintiff's ability to understand, remember, and carry out job instructions, her ability to maintain attention, concentration, persistence and pace, her ability to relate and interact with supervisors, co-workers, and the public, and her ability to adapt to day-to-day work activities were all mildly impaired.  (AR 286-87.)

Dr. Fetterman opined that, "from a psychological standpoint alone," Plaintiff is unable to manage funds, is able to perform one- or two-step simple repetitive tasks but cannot adequately perform complex tasks, has a fair ability to accept instructions from supervisors and interact with coworkers and the public, is unable to perform work activities on a consistent basis without special or additional instruction, has a fair ability to maintain regular attendance in the workplace and complete a normal workday or workweek without interruptions, and has a fair ability to handle normal work related stress.  (AR 287.)  Dr. Fetterman concluded Plaintiff would benefit from continuing mental health counseling and medication, and opined that her prognosis "is fair."

**4.      Consultative Examiners**

On July 26, 2011, consultative examiner Dr. Winston Brown, M.D., completed a psychiatric review technique form, noting Plaintiff suffered from a mood disorder associated with her general medical condition.  (AR 304-17.)  Dr. Brown opined Plaintiff had moderate difficulties in maintaining social functioning and concentration, persistence, or pace, mild restriction in her activities of daily living, and no episodes of decompensation.  (AR 314.)

Dr. Brown also completed a mental functional capacity assessment and opined Plaintiff is moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended period, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions, accept instructions and respond

1   appropriately to criticism from supervisors, respond appropriately to changes in the work setting,

2   and set realistic goals or make plans independently.  (AR 302.)  Dr. Brown noted no significant

3   limitations in any other category.  (AR 302.)  On March 27, 2012, consultative psychiatrist Dr.

4   Cheryl Woodson-Johnson, Psy.D., affirmed Dr. Brown's mental residual functional capacity

5   assessment.  (AR 398.)

6        On September 15, 2011, consultative examiner Dr. Karmen Hopkins, M.D., completed a

7   physical residual functional capacity assessment.  (AR 371-78.)  Dr. Hopkins opined Plaintiff

8   could lift 50 pounds occasionally and 25 pounds frequently, could stand, walk, and sit six hours in

9   an eight hour day, had no manipulative limitations, could never balance but could frequently climb

10  ramps, stairs, ladders, ropes, or scaffolds, could frequently stoop, kneel, crouch, and crawl, and

11  had no environmental limitations.  (AR 371-75.)  Dr. Hopkins opined that though Plaintiff

12  reported pain "all over my body" and limitations imposed by her pain and depression, "[t]here is

13  no objective evidence to support [the] extent of [the] limitations of [activities of daily living]

14  reported . . . and, therefore, [those activities of daily living] are not considered fully credible."

15  (AR 378.)

16       On March 28, 2012, consultative examiner Dr. Alice M. Davidson, M.D., completed a

17  physical residual functional capacity assessment.  (AR 401-08.)  Dr. Davidson opined Plaintiff

18  could lift 10 pounds frequently and 20 pounds occasionally, stand, walk, and sit six hours in an

19  eight-hour day, had no manipulative limitations, could never balance but could occasionally climb

20  ramps, stairs, ladders, ropes, or scaffolds, could frequently stoop, kneel, crouch, and crawl, and

21  had no environmental limitations.  (AR 401-05.)  Dr. Davidson opined Plaintiff was limited to

22  light work with postural restrictions due to her degenerative disc disease, degenerative joint

23  disease, and carpal tunnel syndrome.  (AR 408.)

24  **B.      Written Testimony**

25          **1.      Plaintiff's Adult Disability Form, Function Report, and Pain Questionnaire**

26       On February 24, 2011, Plaintiff's daughter Ramona Yacoub Davoudi completed an adult

27  disability report form on Plaintiff's behalf, reporting that Plaintiff cannot speak, read, or

28  understand English, but can "write more than [her] name in English."  (AR 161.)  Plaintiff

complains of pain in her bilateral arms, low back pain, diplopia, insomnia, and depression, and describes her "mind" as "sometimes . . . not working." (AR 176; 179; 242; 245.) Walking, lifting, bending, standing, sitting, reaching, and using her hands all cause pain, and Plaintiff cannot stand or sit more than an hour at a time. (AR 176; 242.)

On an average day, Plaintiff wakes up late due to trouble sleeping at night, watches television for an hour, prepares frozen food for her lunch, and then takes a nap because she "feel[s] tired, sad or empty, alone, tearful." (AR 178; 244.) Plaintiff is unable to wash or dry her hair without difficulty and pain. (AR 179; 245.) Her daughter organizes Plaintiff's medicine for the week, and calls Plaintiff to remind her to care for her personal needs. (AR 180; 246.) Plaintiff is able to do her own laundry, but does not do any other household chores. (AR 180; 246.) Once a week, Plaintiff's daughter "takes her out" of the house to go shopping. (AR 181; 247.) Plaintiff is able to drive and is able to go out alone. (AR 181; 247.) Plaintiff reports difficulty concentrating more than an hour at a time, "nerves" as a side effect of her medication, and poor ability to follow instructions because she "do[es]n't want to listen to anybody." (AR 183; 249.)

### 2. Plaintiff's Work History Report

Plaintiff worked for two years as a caregiver for an in-home supporting service. (AR 163; 168-75.) Her duties included taking care of elderly clients, cooking, shopping, cleaning, taking them to doctor's appointments, and washing their laundry. (AR 164; 169.) She would walk and stand for six hours, climb and crouch for an hour and a half, stoop and kneel for three and a half hours, crawl for six hours, handle large objects for five hours, and reach for six hours out of a typical day. (AR 164; 169.) The heaviest weight she lifted exceeded a hundred pounds, and she frequently lifted fifty pounds or more, as she frequently pushed shopping carts, lifted her clients from their beds to chairs, and helped her clients take showers. (AR 164.)

### 3. Third Party Adult Function Report

Plaintiff's daughter Ramona Davoudi completed a third party adult function report on March 8, 2012. (AR 232-40.) Ramona speaks with her mother on the phone every day and helps her parents with cleaning, laundry, grocery shopping, and cooking. (AR 233; 238.) She describes Plaintiff's symptoms as including difficulty sleeping, feeling tired/sleepy, anxiety, pain all over

her body and especially her arms, legs, and lower back, dizziness, insomnia, depression, and lack of energy.  (AR 233; 236; 238.)  Ramona gives Plaintiff showers, dries and combs her hair, and noted Plaintiff uses a walker to get to the toilet and to walk.  (AR 234; 240.)  Ramona organizes Plaintiff's medication and calls to remind her to take her pills, and purchases frozen meals for Plaintiff to prepare easily with the microwave.  (AR 233; 235.)  She noted Plaintiff used to go to church and visit with family but is no longer able to do so.  (AR 238.)

**C.    Hearing Testimony**

    **1.    Plaintiff's Testimony**

    Plaintiff testified at a hearing before an ALJ on November 8, 2012, with the aid of an interpreter.  (AR 30-48.)  Plaintiff testified that she could speak Persian and Syrian fluently but could not speak English (AR 31; 35), and that she could read and write in Persian, could neither read nor write in Syrian, and could only read and write "very little" in English (AR 33-34).  Plaintiff testified she does not "read or write [English] well enough to have a grocery list of all [her] shopping needs and go grocery shopping."  (AR 34.)  Plaintiff also stated she is unable to understand enough English to testify without the use of an interpreter.  (AR 35.)  Plaintiff completed nine years of school in Iran.[2]  (AR 33.)  Plaintiff worked for two years as in-home caretaker for elderly individuals.  (AR 34.)

    Plaintiff stated she suffers from depression and pain in her hands, her back, and her left foot.  (AR 34-36.)  She wears prescribed bilateral hand braces, though she only wore one on her left hand at the hearing because the pain is worse on her left side.  (AR 34-36; *see also* AR 37 (noting she is right-handed).)  She is able to lift a gallon of milk with both hands but has trouble lifting anything heavier.  (AR 36.)  She can only use her hands about ten minutes at a time without needing to rest.  (AR 37.)  She testified that her treating physician Dr. Crews prescribed a walker for her to use (AR 36) and complained that her pain worsens when she stands on her left foot for long periods of time (AR 38).  Plaintiff can only stand about a half an hour at a time.  (AR 38.)

//

---

[2]    The Court notes that Plaintiff's statement regarding her completion of nine years of school in Iran is inconsistent with her statement to Dr. Fetterman that she had completed the tenth grade.  (AR 285.)  The ALJ, however, did not address this inconsistency in the decision.

1    Plaintiff reported she takes pain medication and does in-home exercises to relieve her pain.

2    (AR 38.)  She is 5'2" and 200 pounds, and her weight exacerbates her back and knee pain.

3    (AR 38-39.)  She has arthritis in her knees.  (AR 39.)  Her impairments have restricted her ability

4    to do the housework she performed in the past.  (AR 39-43.)  She used to cook meals for her

5    family and now is limited to microwaving frozen meals to feed only herself.  (AR 40.)  She

6    previously attended church and visited with family and friends, and no longer does so due to her

7    "pain and illness."  (AR 40.)

8         **2.   Vocational Expert's Testimony**

9    The vocational expert ("VE") testified at the hearing that Plaintiff had prior relevant work

10   experience as a caregiver, Dictionary of Occupational Titles ("DOT") 354.377-014, medium work

11   with an SVP[3] level of 3 performed as very heavy work.  (AR 44.)  The ALJ asked the VE to note

12   if the VE's testimony was inconsistent with the DOT, and the VE said she would do so.  (AR 44.)

13   The ALJ asked the VE whether a person of Plaintiff's age, education, and work

14   experience, who is limited to light work, simple, routine, and repetitive tasks, and low stress work

15   defined as no more than occasional decision making or changes in the work setting; may only

16   occasionally interact with the public and co-workers; can occasionally climb ramps or stairs,

17   balance, stoop, kneel, crouch, and crawl; can never climb ladders, ropes or scaffolds; and is unable

18   to perform Plaintiff's past relevant work, would be able to perform any other work at the light

19   level.  (AR 45.)  The VE testified that such an individual could work as an assembler, DOT

20   706.684-042, and as a film developer, DOT 976.685-014, both light work with an SVP of 2.

21   (AR 45.)

22   The ALJ posed a second hypothetical, adding to the first the additional restriction that the

23   individual would require "an ambulatory device at all times when standing and walking[.]"

24   (AR 46.)  The VE testified that such a person could not perform any work at the light level.

25

26   ---
     [3]  Specific Vocational Preparation ("SVP"), as defined in DOT, App. C, is the amount of lapsed time required by a
     typical worker to learn the techniques, acquire the information, and develop the facility needed for average
27   performance in a specific job-worker situation.  DOT, App. C, 1991 WL 688702.  Jobs in the DOT are assigned SVP
     levels ranging from 1 (the lowest level - "short demonstration only") to 9 (the highest level - over 10 years of
28   preparation).  *Id.*

1   (AR 46.)  The ALJ posed a third hypothetical, adding to the first the additional restriction that the

2   individual "bilaterally could only occasionally handle and finger[.]"  (AR 46.)  The VE testified

3   that such a person could not perform any work at the light level.  (AR 46.)

4   **D.      Administrative Proceedings**[4]

5          On December 7, 2012, the ALJ issued his decision finding Plaintiff not disabled.  (AR 10-

6   20.)   The ALJ found Plaintiff had severe impairments including degenerative disc disease,

7   bilateral carpal tunnel syndrome, degenerative joint disease of the knees, and depression.  (AR 12.)

8   The ALJ noted that Plaintiff's Body Mass Index score of 36.6 met the identified medical criteria

9   for the diagnosis of obesity.  (AR 12.)  The ALJ determined that Plaintiff's impairments, singly

10  and in combination, did not meet or equal a listed impairment.  (AR 12-13.)  The ALJ found

11  Plaintiff retained the RFC[5] to perform light work as defined in 20 C.F.R. § 416.967(b), with the

12  limitations that she can lift or carry 20 pounds occasionally and 10 pounds frequently; sit, stand,

13  and walk for six hours during an eight-hour work day; occasionally climb ramps or stairs, balance,

14  stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and is limited to work

15  involving simple, routine, and repetitive tasks, low stress work defined as no more than occasional

16  decision making or changes in the work setting, and can only occasionally interact with the public

17  and coworkers.  (AR 13-14.)  The ALJ also determined that Plaintiff "has a limited education and

18  is able to communicate in English."  (AR 18.)

19         Given this RFC, the ALJ found Plaintiff was unable to perform past relevant work but was

20  capable of performing the requirements of representative occupations assembler, DOT 706.684-

21  042, and film developer, DOT 976.685-014.  (AR 18-19.) The ALJ concluded that Plaintiff was

22

23  [4]   Plaintiff was previously denied SSI benefits in a decision dated November 21, 2008.  (*See* AR 52-61; 67-77.)  As
24  the result of that decision is not disputed, the contents of that decision will not be summarized or reviewed in this
    order.

25  [5]   Residual functional capacity ("RFC") is an assessment of an individual's ability to do sustained work-related
    physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week,
26  or an equivalent work schedule.  Social Security Ruling ("SSR") 96-8p.  The RFC assessment considers only
    functional limitations and restrictions that result from an individual's medically determinable impairment or
27  combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in
    the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are
    reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th
28  Cir. 2006).

1   not disabled, as defined in the Social Security Act, from February 4, 2011, the date the application

2   was filed, through the date of the decision.  (AR 20.)  Plaintiff sought review of the ALJ's decision

3   with the Appeals Council on February 7, 2014 (AR 5-6), but review was denied on April 10, 2014,

4   making the ALJ's decision final (AR 1-4).

5   **E.      Plaintiff's Complaint**

6          On June 10, 2014, Plaintiff filed a complaint before this Court seeking review of the ALJ's

7   decision.  (Doc. 1.)  Plaintiff contends the ALJ erred by failing to adequately consider Plaintiff's

8   illiteracy in his RFC assessment, improperly weighing the medical evidence, and improperly

9   assessing Plaintiff's credibility.  (Docs. 18; 24.)

10                              **III.    SCOPE OF REVIEW**

11         The ALJ's decision denying benefits "will be disturbed only if that decision is not

12   supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,

13   601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

14   judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

15   Instead, the Court must determine whether the Commissioner applied the proper legal standards

16   and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

17   *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

18         "Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v.*

19   *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

20   relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

21   *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

22   305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

23   the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

24   may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v.*

25   *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

26                              **IV.    APPLICABLE LAW**

27         An individual is considered disabled for purposes of disability benefits if he is unable to

28   engage in any substantial, gainful activity by reason of any medically determinable physical or

mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In Step 1, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.    20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, the ALJ must determine at Step 2 whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).   If so, the ALJ moves to Step 3 and determines whether the claimant has a severe impairment or combination of impairments that meet or equal the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is therefore presumptively disabled.  *Id.* §§ 404.1520(d), 416.920(d).   If not, at Step 4 the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform her past work.  *Id.* §§ 404.1520(f), 416.920(f).   If not, at Step 5, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).   If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.   DISCUSSION

Plaintiff contends the ALJ erred by failing to adequately consider or incorporate Plaintiff's illiteracy in his RFC assessment, improperly weighing the medical evidence, and improperly assessing Plaintiff's credibility.  (Docs. 18; 24.)

//

1    **A.      The ALJ's Evaluation of Testimony**

2         Plaintiff asserts the ALJ failed to articulate clear and convincing reasons for discounting

3    her statements regarding the severity and extent of her ongoing symptoms.  (Doc. 18, pp. 10-13.)

4    The Commissioner contends the ALJ properly evaluated Plaintiff's subjective complaints.  (Doc.

5    22, pp. 10-13.)

6         **1.      Legal Standard**

7         In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ

8    must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Bunnell*

9    *v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc).  First, the ALJ must determine whether

10   the claimant has presented objective medical evidence of an underlying impairment that could

11   reasonably be expected to produce the pain or other symptoms alleged.  *Vasquez*, 572 F.3d at 591.

12   The claimant is not required to show that her impairment "could reasonably be expected to cause

13   the severity of the symptom [she] has alleged; she need only show that it could reasonably have

14   caused some degree of the symptom."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).   If the

15   claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the

16   claimant's testimony about the severity of the symptoms if she gives "specific, clear and

17   convincing reasons" for the rejection.  *Id.*

18        The ALJ also may consider (1) the claimant's reputation for truthfulness, prior inconsistent

19   statements, or other inconsistent testimony, (2) unexplained or inadequately explained failure to

20   seek treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities.

21   *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Bray v. Comm'r of Soc. Sec.*

22   *Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir.

23   1996);  20 C.F.R.  §§ 404.1529, 416.929.   "If the ALJ's finding is supported by substantial

24   evidence, the court may not engage in second-guessing."  *Tommasetti*, 533 F.3d at 1039.

25        **2.      The ALJ Pointed to Substantial Evidence in the Record to Discount Plaintiff's**
26              **Credibility**

27        Plaintiff contends the ALJ improperly discredited her testimony as inconsistent with the

28   ALJ's RFC assessment and the objective medical evidence.  (Doc. 18, p. 12.)  The Commissioner

asserts the ALJ properly found the evidence in the record did not support Plaintiff's testimony of subjectively disabling pain and symptoms.  (Doc. 22, p. 11.)  Plaintiff responds that the ALJ relied solely upon objective medical evidence to find her not credible, "in clear violation of precedent." (Doc. 24 p. 5.)

In weighing a claimant's credibility, the ALJ may consider her reputation for truthfulness, inconsistencies either in her testimony or between her testimony and her conduct, her daily activities, her work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which she complains.  *Smolen*, 80 F.3d at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting *Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir.1995)).  While the ALJ is required to consider a claimant's statements about her symptoms, in evaluating the intensity and persistence of those symptoms, the ALJ considers "all of the available evidence."  20 C.F.R. § 404.1529(c).  This includes objective medical evidence, defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2).  It also includes "other evidence," such as "information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)[.]" 20 C.F.R. § 404.1529(c)(3).

While the inconsistency of objective findings with subjective pain complaints may not be the sole reason for rejecting subjective complaints of pain, *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997); *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.1995); Social Security Rule ("SSR") 95-5P[6]1995 WL 670415, at *1, it is one factor which may be permissibly considered with others, *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *Morgan v. Comm'r of Soc. Sec.*

---

[6]    The Commissioner issues Social Security Rulings to clarify the Secretary's regulations and policy.  *See Bunnell v. Sullivan*, 947 F.2d 341, 346 n.3 (9th Cir. 1991).  The Secretary's interpretation of 20 C.F.R. §§ 404.1529 and 416.929 is found in SSR 88-13.  *Id.*  "Although SSRs are not published in the federal register and 'do not have the force of law,' we nevertheless give deference to the Secretary's interpretation of its regulations."  *Id.* (internal citations omitted).

1    *Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).  Here, however, the ALJ permissibly pointed to both

2    the objective medical evidence *and* to other evidence in discounting Plaintiff's credibility.

3    (AR 14-18.)

4    *//*

5        The ALJ first reviewed the objective medical evidence of the record that was inconsistent

6    with Plaintiff's testimony regarding the limitations imposed by her medically determinable

7    impairments.  (AR 16.)  "The record does not demonstrate clearly that she has the significantly

8    limited range of motion, muscle spasms, muscle atrophy, motor weakness, sensation loss, or reflex

9    abnormalities, which are associated with intense and disabling pain."  (AR 16.)  The ALJ pointed

10    to Dr. Hawlett's findings that Plaintiff retained full range of motion in her right knee with mild

11    crepitus as inconsistent with Plaintiff's claims of extremely limited functional capacity.  (AR 16.)

12    The ALJ also pointed to multiple imaging studies of Plaintiff's knees, right ankle, and left foot as

13    revealing only "mild" patellar spurring, moderate posterior and plantar calcaneal spurring, and no

14    other abnormalities.  (AR 18; *see* 344; 345; 442-44.)  A lumbar spine x-ray similarly revealed only

15    mild degenerative changes and no subluxation.  (AR 366.)  On examination, Dr. Wagner observed

16    that Plaintiff had motor strength of 5/5 in her bilateral upper and lower extremities, mild

17    paravertebral muscle tenderness, and continuous grinding in the left knee with no real tenderness.

18    (AR 280; 282.)

19        The ALJ then discussed "other evidence" within the record, including the opinion evidence

20    of Plaintiff's treating and examining medical sources.  (AR 15-18.)  The ALJ noted that examining

21    physician Dr. Wagner opined Plaintiff does not require the use of assistive devices and "can walk

22    fine without the walker."  (AR 16.)  Despite that Plaintiff appeared at the examination with a

23    walker, during the examination, she was able to "easily" get out of her chair in the waiting room,

24    sat comfortably throughout the entire history table, get on and off the examination table slowly,

25    "easily" bend over at the waist, walk on her toes and on her heels, and take off her shoes and put

26    them on without significant problems.  (AR 15; *see also* AR 279-81.)  Dr. Wagner further opined

27    that while Plaintiff "complained" during the examination, she "did not give good effort with the

28    upper extremity motor strength examination."  (AR 15; *see also* AR 282.)

1    During the hearing, Plaintiff testified that Dr. Crews had prescribed both handbraces and a

2  walker (AR 36); as the ALJ noted, however, there is no indication in the medical record Dr. Crews

3  or any other physician prescribed an assistive device to aid Plaintiff in walking (AR 18; *see* AR

4  272; 318-48; 409-53; 454.)   "In weighing a [Plaintiff]'s credibility, the ALJ may consider

5  'ordinary techniques of credibility evaluation, such as . . . other testimony by the claimant that

6  appears less than candid[.]'"   *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir.

7  2010) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)); *see also Molina v. Astrue*,

8  674 F.3d 1104, 1112 (9th Cir. 2012).  Plaintiff's testimony that she had been prescribed a walker

9  by Dr. Crews is not supported by the record, and the ALJ permissibly pointed to this inconsistency

10 at several points in his opinion in discounting Plaintiff's credibility.  *Verduzco v. Apfel*, 188 F.3d

11 1087, 1090 (9th Cir. 1999) (ALJs may consider whether the Plaintiff's testimony is believable or

12 not).

13    In sum, the ALJ's reasons were properly supported by the record and sufficiently specific

14 to allow the Court to conclude that he rejected Plaintiff's testimony on permissible grounds, and

15 did not arbitrarily discredit Plaintiff's testimony.

16 **B.    The ALJ's Evaluation of the Medical Evidence**

17    Plaintiff next contends the ALJ improperly rejected treating physician Dr. Crews' medical

18 opinion regarding Plaintiff's functioning.  (Doc. 18, pp. 13-17.) The Commissioner responds that

19 substantial evidence supports the ALJ's evaluation of Dr. Crews' opinion.  (Doc. 17, pp. 7-9.)

20    **1.    Legal Standard**

21    The medical opinions of three types of medical sources are recognized in Social Security

22 cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not

23 treat the claimant (examining physicians); and (3) those who neither examine nor treat the

24 claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

25 Generally, a treating physician's opinion should be accorded more weight than opinions of doctors

26 who did not treat the claimant, and an examining physician's opinion is entitled to greater weight

27 than a non-examining physician's opinion.  *Id.*

28 //

1   Where a treating or examining physician's opinion is uncontradicted by another doctor, the

2   Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's

3   ultimate conclusions.  *Id.*  If the treating or examining doctor's medical opinion is contradicted by

4   another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that

5   medical opinion, and those reasons must be supported by substantial evidence in the record.  *Id.* at

6   830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009).  The

7   ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and

8   conflicting clinical evidence, stating her interpretation thereof, and making findings.  *Tommasetti*,

9   533 F.3d at 1041.

10   **2.   The ALJ Stated Legally Sufficient Reasons for Rejecting Dr. Crews' Opinion**

11   Plaintiff contends the ALJ failed to give legally sufficient reasons for rejecting Dr. Crews'

12   opinion that Plaintiff "was prevented from meaningful employment due to chronic low back pain,

13   carpal tunnel syndrome, hypercholesterolemia, depression, diplopia and insomnia" and her

14   assessment of Plaintiff's functional limitations.  (Doc. 18, pp. 13-17.)  In the decision, the ALJ

15   gave "little weight" to Dr. Crews' opinion because:

16   . . . The course of treatment pursued by [Dr. Crews] has not been consistent with
     what one would expect if [Plaintiff] were truly disabled, as the doctor has
17   reported.  Image studies taken on May 31, 2012, of the [Plaintiff's] right and left
     knee revealed "mild" patellar spurring.  Images of her right ankle were normal.
18   Images of the left foot revealed calcaneal spurring with no other abnormalities.
     The doctor apparently relied quite heavily on the subjective report of symptoms
19   and limitations provided by [Plaintiff], and seemed to uncritically accept as true
     most, if not all, of what [Plaintiff] reported.  Furthermore, Dr. Crews[ ] is very
20   specific in listing limitations such as elevating [Plaintiff]'s feet for 2-3 hours[,]
     however, she did not mention anything about using a cane or walker to ambulate.
21   Lastly, Dr. Crews' opinion that [Plaintiff] is permanently disabled touches on an
     ultimate issue that is reserved to the [C]ommissioner and is therefore not afforded
22   controlling weight[.]
23

24   (AR 18.)

25   Plaintiff asserts the ALJ impermissibly rejected Dr. Crews' opinion because the ALJ

26   believed Dr. Crews' opinion relied on Plaintiff's subjective complaints.  (Doc. 18, p. 15.)  Plaintiff

27   contends that a "physician can, with firsthand impressions and clinical evidence, give credence to

28   a [Plaintiff]'s subjective claims."  (Doc. 18, p. 15 (citing *Ryan v. Commissioner of Social Sec.*, 528

F.3d 1194, 1199-1200).)  Plaintiff's reliance on *Ryan* is misplaced, however, because Dr. Crews'
2008 letter and 2012 questionnaire are not supported by "firsthand impressions and clinical
evidence" in the record.  (*See* AR 272; 454.)

    A review of Dr. Crews' treating notes, letter, and single-page questionnaire reveal only
diagnoses and opined limitations imposed by those diagnoses; there are no clinical observations
offered in support of Dr. Crews' conclusory opinion in the 2008 letter and 2012 questionnaire that
Plaintiff is disabled.  (*See* AR 272; 318-48; 409-53; 454.)  In her 2008 letter, Dr. Crews does not
refer to any objective medical evidence (AR 272); in her 2012 assessment, Dr. Crews lists several
imaging studies as objective evidence supporting her opinion (AR 454).  However, a review of the
results of these studies offers no support for Dr. Crews' opinion of total disability.  (*See* AR 344
(2010 left foot x-ray revealed moderate calcaneal spurring); 345 (2010 left knee x-ray revealed no
significant problems and right knee x-ray revealed mild patellar spurring); 366 (2011 lumbar spine
x-ray revealed mild degenerative changes); 442 (right knee x-ray revealed mild patellar spurring);
443 (2011 right ankle x-ray revealed no abnormalities).  In the absence of objective medical
evidence or clinical observations supporting Dr. Crews' opinion, the ALJ reasonably determined
that Dr. Crews' opinion must have relied "quite heavily" on Plaintiff's subjective complaints and
description of her symptoms and limitations.  (AR 18.)

    As discussed above, the ALJ properly discounted Plaintiff's excess pain testimony.
Therefore, the ALJ did not err in rejecting Dr. Crews' opinion because it is based "to a large
extent" on Plaintiff's self-reports that had already been discounted as incredible.  *Tommasetti*, 533
F.3d at 1041 (citing *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999)) ("An
ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a [plaintiff]'s self-
reports that have been properly discounted as incredible"); *Tonapetyan v. Halter*, 242 F.3d 1144,
1149 (9th Cir. 2001) (where the record supports the ALJ in discounting the plaintiff's credibility,
the ALJ's rejection of a treating physician's opinion premised on the plaintiff's subjective
complaints was also proper); *Fair v. Bowen*, 885 F.32d 597, 605 (9th Cir. 1989).

    Plaintiff also asserts the ALJ impermissibly rejected Dr. Crews' opinion that Plaintiff
needed to elevate her feet every two to three hours because Dr. Crews failed to mention Plaintiff's

1  use of a cane or walker to ambulate.  (Doc. 18, p. 16.)  Plaintiff contends that these facts have

2  nothing to do with each other, and the ALJ impermissibly assumed that only someone requiring

3  the prescription of an assistive device would have any need to elevate her legs at these intervals.

4  (Doc. 18, pp. 16-17.)  The Commissioner does not address this issue in her brief.  (Doc. 22.)

5       In her treating notes, Dr. Crews observed that Plaintiff used shoe inserts and walked

6  barefoot at home in February 2010 (AR 331) and appeared at a May 2011 appointment "walking

7  slowly with a walker" (AR 324), but at no point did Dr. Crews opine that Plaintiff required the use

8  of any assistive device to aid Plaintiff in walking (*see* AR 272; 318-48; 409-53; 454).  On its own,

9  the ALJ's assumption that Plaintiff's need to elevate her legs would necessitate a prescription for

10 an assistive device is not a sufficient basis to reject that portion of Dr. Crews' opinion.  However,

11 Dr. Crews opinion was not rejected on this basis alone.  Rather, in the absence of any supporting

12 and consistent objective findings or clinical observations, Dr. Crews' opinion that Plaintiff must

13 "lie down or elevate her legs" for "2-3 hours" in an 8-hour workday appears to have been based on

14 Plaintiff's own self-reported limitations.   (*See* AR 454.)   Accordingly, because the ALJ

15 permissibly rejected Plaintiff's testimony, any portion of Dr. Crews' opinion based on Plaintiff's

16 self-reports was also permissibly rejected.  *Tommasetti*, 533 F.3d 1035, 1041; *Bray*, 554 F.3d at

17 1228.  The ALJ did not err by rejecting Dr. Crews' opinion that Plaintiff needed to elevate her legs

18 for two to three hours in a workday.

19      Plaintiff finally asserts the ALJ impermissibly rejected Dr. Crews' medical opinion based

20 on her failure to prescribe a course of treatment consistent with total disability.  (Doc. 18, p. 15.)

21 Plaintiff contends that the ALJ failed to identify what course of treatment beyond physical

22 therapy, cortisone injections, anti-inflammatory medication, and narcotic pain medication "would

23 be necessary to fulfill this arbitrary requirement."  (Doc. 18, p. 15.)  The Commissioner contends

24 the ALJ properly pointed to Plaintiff's conservative treatment history with Dr. Crews, including

25 physical therapy, a prescription for a wrist brace, and medication, as inconsistent with the level of

26 treatment one would expect for a patient with disabling impairments.  (Doc. 22, p. 14.)

27      The record indicates that Plaintiff failed to follow the fairly conservative course of

28 treatment recommended to address her physical impairments.  For example, Dr. Crews referred

1    Plaintiff to physical therapy in 2008, where Plaintiff quit after eleven session because she "did not

2    want to continue" despite making gains in range of motion and strength (AR 464), and again in

3    2011, where therapy was discontinued after twelve sessions because there was no significant

4    progress overall (AR 462.)   Dr. Crews recommended a cortisone injection in June 2010 to treat

5    Plaintiff's left foot spurring, but it is unclear whether Plaintiff actually received this injection.

6    (AR 330; *see also* AR 280 (examining physician Dr. Wagner noted that Plaintiff had never had

7    surgery or arthrocentesis and refused an injection, and that carpal tunnel release surgery had been

8    recommended but Plaintiff had declined); 347 (Dr. Hawley noted Plaintiff had received a cortisone

9    injection in her left knee but it had not successfully relieved her symptoms).)   Dr. Crews also

10   recommended, and Plaintiff declined, an orthopedic referral in July of 2012.  (AR 417.)   It is not

11   clear from the record, however, what more Dr. Crews could have done, given that Plaintiff did not

12   follow her recommendations.      Had Plaintiff actively pursued Dr. Crews' repeated

13   recommendations for physical therapy, injections, and surgical intervention, her course of

14   treatment would have comprised more than basic "conservative treatment."  *See Parra v. Astrue*,

15   481 F.3d 742, 751 (9th Cir. 2007), *cert. denied*, 552 U.S. 1141 (2008) (quoting *Johnson v.*

16   *Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)) (treatment with over-the-counter medication is

17   "conservative treatment" sufficient to discount credibility as to the severity of an impairment).

18        The Court is not persuaded that the ALJ's belief that this course of treatment was

19   inconsistent with total disability is a permissible reason to reject Dr. Crews' medical opinion, as

20   *Plaintiff's* failure to follow Dr. Crews' recommended course of treatment does not necessarily

21   affect *Dr. Crews'* credibility.   Any error in discounting Dr. Crews' opinion on this basis was

22   harmless, however, because the ALJ articulated several other legally sufficient reasons for

23   discounting Dr. Crews' medical opinion.  *Stout v. Comm'r of Soc. Security*, 454 F.3d 1050, 1054-

24   55 (9th Cir. 2006) (harmless error is inconsequential to the nondisability determination).

25        In sum, the ALJ articulated legally sufficient reasons for discounting Dr. Crews' opinion.

26   **C.      The ALJ's Evaluation of Plaintiff's Ability to Speak English**

27        Plaintiff asserts the ALJ erred by not including Plaintiff's English fluency limitation in his

28   assessed RFC, and by not providing a reasonable explanation for how a non-English speaker could

1   perform any of the jobs identified by the VE.  (Doc. 18, pp. 6-10.)  The Commissioner responds

2   that "Plaintiff's ability to communicate in English is an educational factor that need not be

3   included in an RFC assessment," Plaintiff's ability to communicate in English can be inferred

4   from her testimony, and the ALJ properly relied on the VE's testimony that Plaintiff could

5   perform the requirements of the identified occupations.  (Doc. 22, pp. 8-9.)  The Commissioner

6   also asserts Plaintiff's contentions of illiteracy are not relevant because the ALJ found Plaintiff

7   could perform unskilled work, and the regulations consider literacy as having "little significance"

8   to her ability to perform unskilled work.  (Doc. 22, p. 9.)

9        **1.    Legal Standards**

10       The Commissioner bears the burden of proving Plaintiff is literate as part of the ALJ's

11  vocational analysis where, as here, Plaintiff has raised the question of her literacy.  *Silveira v.*

12  *Apfel*, 204 F.3d 1257, 1261 n.14 (9th Cir. 2000); 20 C.F.R. § 416.912(g).  An ALJ must assess

13  *both* a claimant's "literacy" and "ability to communicate in English" in determining whether a

14  claimant can perform work pursuant to the regulations.  20 C.F.R. §§ 404.1564(b), 416.964(b); *see*

15  *also Broadway v. Colvin*, No. 1:13-CV-00793-SKO, 2014 WL 4249153 (E.D. Cal. Aug. 26,

16  2014); *Calderon v. Astrue*, No. 1:08-CV-01015-GSA, 2009 WL 3790008, at *9 (E.D. Cal. Nov.

17  10, 2009).  "Illiteracy" is defined as the "inability to read or write."  20 C.F.R. §§ 404.1564(b)(1),

18  416.964(b)(1).  A claimant who is able to read or write a simple message in English is not

19  considered illiterate.  *Id.*  The ability to "communicate in English" requires the ability to "speak,

20  read, and understand" the language.  *Id.*, at 404.1564(b)(5), 416.964(b)(5).  The Ninth Circuit has

21  clarified that a claimant is considered "illiterate or unable to communicate in English" if she

22  demonstrates she is either illiterate *or* unable to communicate in English *or* both.  *Silveira*, 202

23  F.3d at 1262, n.13.

24       **2.    The ALJ Did Not Properly Evaluate Plaintiff's Literacy**

25       The ALJ made no finding as to Plaintiff's literacy at Step Five, stating only that she is

26  "able to communicate in English" at Step Four.  (AR 18.)  The ALJ did not make any other

27  findings relating to Plaintiff's literacy, and the record does not demonstrate Plaintiff's literacy.

28  Although the ALJ concluded Plaintiff was literate, substantial evidence did not support that

finding.  (AR 18.)  Plaintiff testified she completed nine years of school in Iran, can read and write in Persian, cannot read or write in Syrian, and can read and write in English only "very little." (AR 33-34.)  There is nothing in the record explaining, and the ALJ did not make any finding describing, what "very little" means.  (*See* AR.)  In her disability report, Plaintiff stated that she cannot speak, read, or understand English but answered affirmatively when asked if she can "write more [her] name in English."  (AR 161.)  Plaintiff testified that she is unable to read or write enough English to "have a grocery list of all [her] shopping needs and go grocery shopping." (AR 34.)   Plaintiff's Adult Function Report was completed by and signed by her daughter. (AR 185.)  Both examining physicians noted that Plaintiff required an interpreter.  (AR 279; 285.)

While the ability to read or write even a simple message in English may lead to a finding of literacy, 20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1), the record is not clear as to whether Plaintiff is capable of doing so (*compare* AR 161 (Plaintiff can write at least her name in English) *with* 34 (Plaintiff is unable to write or read a grocery list).  Even if the ALJ's conclusion that Plaintiff is "able to communicate in English" were supported by substantial evidence in the record, there is no finding or evidence in the record as to whether Plaintiff is *literate*.

### 3. The ALJ Erred by Failing to Properly Incorporate Plaintiff's Illiteracy into the Hypotheticals Posed to the VE

Plaintiff argues the ALJ failed to properly incorporate Plaintiff's illiteracy in his hypotheticals to the VE or the resulting RFC.  (Doc. 18, pp. 7-9.)  The ALJ did not include any reference to Plaintiff's ability to read and write English in his hypotheticals to the VE during the hearing and did not address Plaintiff's literacy in his decision.  (AR 12-20.)  Neither the ALJ nor the VE addressed the impact of Plaintiff's literacy on her ability to find and perform the requirements of unskilled work.  (AR 18-20; 44-47.)   The Commissioner contends the ALJ properly relied on the testimony of the VE because the VE necessarily took Plaintiff's ability to communicate in English into account, since "the VE had heard Plaintiff's testimony that was given with the assistance of an interpreter, including that she completed nine years of schooling in Iran and read and wrote 'very little' in English."  (Doc. 22, p. 9.)

//

While a claimant is not per se disabled if he or she is illiterate, the ALJ must "definitively explain" the impact of a claimant's illiteracy on her ability to find and perform either past relevant work or alternative work. *Pinto v. Massanari*, 249 F.3d 840, 848 (9th Cir. 2001). The ALJ did not address Plaintiff's literacy, but found Plaintiff capable of performing the requirements of light, unskilled work as an assembler, DOT 706.684-042, and as a film developer, DOT 976.685-014. (AR 19.) Both positions require a Language Level of 1. Although it may be reasonable to assume, as the Commissioner argues in her brief, that Plaintiff has some English language skills based on her answering questions before the interpreter finished interpreting them during the hearing[7], has a California driver's license, and has lived in the United States for twelve years (Doc. 22, pp. 8-9), the impact of Plaintiff's illiteracy on her ability to work was not given express consideration by the ALJ or the VE. The Court may review *only* the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630. Because the VE did not address the impact of Plaintiff's limited ability or inability to read and write in English, it is only an assumption that Plaintiff's illiteracy does not impact her ability to perform the requirements of these jobs and that assumption is not sufficient to conclude that any failure to expressly consider Plaintiff's literacy was harmless.

The "representative occupations" which the VE testified Plaintiff can perform all require a Language Level of 1. *See* DOT 706.684-042; 976.685-014. Language Level 1 requires that a person have the following skills:

| | |
|---|---|
| Reading: | Recognize meaning of 2,500 (two- or three-syllable) words. Read at a rate of 95-120 words per minute. Compare similarities and differences between words and series of numbers. |
| Writing: | Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses. |
| Speaking: | Speak simple sentences, using normal word order, and present and past tenses. |

*See* 920.587-018; 319.484-010; 311.677-010.

---

[7] The Commissioner interprets Plaintiff's occasionally answering question before the interpreter was finished as evidence that Plaintiff knew or understood the questions being posed by the ALJ, in English. It is unclear, however, whether this is in fact the case. Based on a review of the transcript, the Court is unable to conclusively determine that Plaintiff was answering the questions as asked in English, or if she was speaking directly to the interpreter to ask for clarification, to offer her answer, or to make some other comment.

1   "The ability to communicate is an important skill to be considered when determining what

2   jobs are available to a claimant.  Illiteracy seriously impacts an individual's ability to perform

3   work-related functions such as understanding and following instructions, communicating in the

4   workplace, and responding appropriately to supervision."  *Pinto*, 249 F.3d at 846; *see also*

5   20 C.F.R. § 416.695(b)(5) ("[W]e consider a person's ability to communicate in English when we

6   evaluate what work, if any, he or she can do").  An ALJ's failure to explain how a plaintiff's

7   illiteracy limitation related to his finding that the plaintiff could perform her past relevant work as

8   generally performed is reversible error.  *Pinto*, 249 F.3d at 847.

9       Here, the ALJ neither expressly included Plaintiff's illiteracy as a limitation in his

10  hypotheticals to the VE – though he did ask the VE to consider Plaintiff's "education" and

11  "language" – nor did he address Plaintiff's illiteracy in his decision.  (AR 14; 18 (determining

12  Plaintiff is "able to communicate in English" but making no finding as to Plaintiff's literacy); 44-

13  47.)  Despite that Plaintiff testified she is unable to read or write enough English to make or use a

14  grocery list for shopping (AR 34), the ALJ did not ask and the VE failed to explain the impact of

15  Plaintiff's illiteracy on her ability to perform the requirements of these representative occupations

16  and failed to account for any deviation from the Language Level 1 requirement set forth in the

17  DOT descriptions.  The fact that Plaintiff previously performed her past relevant work as a

18  caretaker or obtained a driver's license without being literate in English is neither sufficient nor

19  persuasive evidence to support a deviation from the DOT requirement as to other work.  *See*

20  *Pinto*, 249 F.3d at 847; *Mui Si Voong v. Astrue*, 641 F. Supp. 2d 996, 1009-10 (E.D. Cal. 2009)

21  (the fact plaintiff passed a citizenship test and obtained a driver's license did not mean she could

22  speak and read English, even at Language Level 1).  Although a plaintiff "is not per se disabled if

23  he or she is illiterate," the ALJ's failure to provide a reasonable explanation for his deviation from

24  the DOT's language requirements to find Plaintiff capable of performing the alternative work

25  identified is erroneous.  *Pinto*, 249 F.3d at 847.

26      The ALJ failed to provide any explanation as to why he found Plaintiff able to perform the

27  requirements of  work requiring Language Level 1 English reading, writing, and speaking abilities

28  (AR 19), despite substantial evidence that Plaintiff is unable to read, write, or speak English at

25

1  Language Level 1 (AR 34-35; 161; 279; 285).   As discussed, it is not clear from the ALJ's

2  decision whether Plaintiff is illiterate in English, and it is not clear whether Plaintiff's illiteracy

3  would impair her ability to perform light, unskilled work in either of the representative occupations

4  the ALJ lists.   *See Mui Si Voong*, 641 F. Supp. 2d at 1009-10 (remanding the case for further

5  consideration because the hypothetical relied upon by the ALJ did not account for plaintiff's need

6  for an interpreter to explain instruction on how to perform one- to three-step commands).   Because

7  the ALJ made very few findings and relied largely on the conclusions of the VE, it is difficult for

8  this Court to review the decision.   As the Ninth Circuit has repeatedly stated, "requiring the ALJ to

9  make specific findings on the record at each phase of the step four analysis provides for

10  meaningful judicial review.   When . . . the ALJ makes findings only about the [Plaintiff]'s

11  limitations, and the remainder of the step four assessment takes place in the [VE's] head, we are

12  left with nothing to review."   *Pinto*, 249 F.3d at 847 (internal quotation omitted).

13       The Commissioner contends that Plaintiff's contentions of illiteracy are ultimately

14  harmless because the ALJ found Plaintiff could perform unskilled work, and the regulations state

15  literacy has the least impact on performing unskilled work.   (Doc. 22, p. 9.)   The Commissioner's

16  argument is based on the presumption that the ALJ's application of the Medical-Vocational

17  Guidelines ("Grids"), which state literacy has the least impact on unskilled work, was appropriate.

18  (*See* Doc. 22, p. 9 (citing 20 C.F.R. pt. 404, Subpt. P, App. 2 § 202.00(g).)   However, the ALJ did

19  not rely on the Grids to determine whether Plaintiff was disabled.   (AR 18.)   The ALJ employed a

20  VE to determine the potential work Plaintiff could perform and failed to include Plaintiff's literacy

21  in any hypothetical posed to the VE.   (AR 44-47.)   The ALJ's failure to properly analyze

22  Plaintiff's literacy cannot be deemed harmless because, were Plaintiff illiterate, proper

23  hypotheticals to the VE would include illiteracy.   Upon remand the ALJ must resolve the

24  ambiguity of Plaintiff's literacy and, if appropriate, include illiteracy in Plaintiff's RFC and in the

25  vocational analysis at Step Five.

26       Based on the foregoing, the VE's testimony that Plaintiff can perform work as an assembler

27  and a film developer conflicts with the DOT Language Level requirements of those jobs, and the

28  ALJ's finding that Plaintiff can perform the requirements of these representative occupations is not

1    supported by substantial evidence.

2    **D.**      **Remand for One Issue**

3           This case shall be remanded for the ALJ to consider whether Plaintiff is illiterate and, if so,

4    whether her illiteracy seriously impacts Plaintiff's ability to work.

5           In all other respects, the ALJ's findings are affirmed.

6                                    **VI.    CONCLUSION**

7           Based on the foregoing, the Court finds that remand is necessary to reconsider the impact

8    of Plaintiff's illiteracy on her RFC.  Accordingly, the Court GRANTS Plaintiff's appeal from the

9    administrative decision of the Commissioner of Social Security.  The Clerk of this Court is

10   DIRECTED to enter judgment in favor of Plaintiff Jarman Yacoub and against Defendant Carolyn

11   W. Colvin, Acting Commissioner of Social Security.

12
13   IT IS SO ORDERED.

14   Dated:   **February 11, 2016**                            **/s/ Sheila K. Oberto**
                                                      UNITED STATES MAGISTRATE JUDGE
15

16

17

18

19

20

21

22

23

24

25

26

27

28